UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:   Xtra Petroleum Transport, Inc.,                              Case No. 11-12639-j11

       Debtor.

---

Xtra Petroleum Transport, Inc.,

       Plaintiff,

     v.                                                                 Adversary No. 12-1155-j

Brad Hall & Associates, Inc.,

       Defendant.

---

## **MEMORANDUM OPINION**

This matter came before the Court following a trial on the merits of Plaintiff Xtra Petroleum Transport Inc.'s Complaint for Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B) As to Brad Hall & Associates, Inc. and For Avoidance of Transfers under 11 U.S.C. § 547 (the "Complaint") on February 28 and March 6, 2012. After taking evidence, hearing oral argument, and considering the briefs of the parties, and being otherwise fully informed, the Court hereby finds that Plaintiff is not entitled to set aside the alleged fraudulent transfer but may recover a portion of its claimed preferential transfer.

**FACTS**

*Initial Background*

Mrs. and Mr. Parseghian have been involved in the petroleum business together in varying capacities for almost three decades. They wed in 1986. Sarkis Parseghian already

owned a gas station in California at that time, and Mrs. Parseghian began to work with him. At some point, they owned a transport petroleum company called Lemont Truck Line. What happened between that period and the early 2000s was not specifically disclosed, nor is it necessarily relevant to this case. The Court simply notes that the Parseghians were involved in various aspects of the petroleum business together.

Mr. Parseghian eventually entered into a business relationship with a man named Marwan El-Dana. Mr. El-Dana and Mr. Parseghian were partners in a California partnership based out of Apple Valley, California called Savoy Truck Stop. Although Savoy Truck Stop formed as a California partnership, the truck stop was located in Deming, New Mexico. It did business under the name Savoy Truck Stop, and included fuel pumps and a convenience store. Mr. El-Dana also owned a transport company known as Xtra Tank Lines ("Xtra Tank"), located in Apple Valley, California, for which Mr. Parseghian worked after he and his wife ceased operating their Lemont Truck Line business.

Mrs. Parseghian also became an employee of Xtra Tank. At first, she merely took over bookkeeping duties, but the company "grew dramatically" – it became a 35-truck company – and her duties expanded. She processed accounts payable, hired new employees, and put policies and systems into place relating to regulatory compliance, which was a serious responsibility, considering that Xtra Tank hauled hazardous material. However, Xtra Tank eventually ran into financial trouble and developed a rocky relationship with the California Highway Patrol. Xtra Tank folded in 2004. There is no evidence before the Court regarding whether Mr. Parseghian had any involvement or ownership interest in Xtra Tank, other than as an employee.

In 2004, at around the same time that Xtra Tank closed, Mrs. Parseghian formed Xtra Petroleum Transport, Inc. (hereinafter referred to as either "Xtra Petroleum" "Plaintiff" or

"Debtor") and it commenced operations. Mrs. Parseghian is its president. Mrs. Parseghian testified that she owns all of its capital stock. Xtra Petroleum purchased petroleum transport vehicles from Xtra Tank and continued to survive on Xtra Tank's former customers. Xtra Petroleum's headquarters initially was a house that was located on the Savoy Truck Stop property. Mrs. Parseghian testified that Xtra Petroleum rented the house from Savoy Truck Stop, and that Savoy Truck Stop's offices were in a separate building. She also testified that she funded Xtra Petroleum with her own money and money that she borrowed from her parents, and that she was the ultimate decision maker for Xtra Petroleum. Ms. Parseghian's husband, Sarkis Parseghian, is an employee of Xtra Petroleum, which is a common carrier transport company that specializes in hauling petroleum products. Although Mr. Parseghian has significant responsibilities at his wife's trucking company, including dispatching drivers and managing repair and maintenance of Xtra Petroleum's trucks, Mrs. Parseghian testified that she made the ultimate decisions for Xtra Petroleum. She also testified that she took Mr. Parseghian's counsel, amongst others.

*Brad Hall & Associates v. Savoy Truck Stop and Sarkis Parseghian*

Brad Hall & Associates, Inc. ("BH & Associates") is a supplier of bulk petroleum fuels that has been in operation since approximately 1993. BH & Associates is a successful company with nationwide operations, including some in New Mexico. Its primary business is marketing fuel to retail fuel facilities (*i.e.* truck stops and gas stations). Savoy Truck Stop is a former client of BH & Associates. Savoy Truck Stop became a *former* client because it quit paying its bills to BH & Associates as they came due. Xtra Petroleum delivered at least some of the fuel to Savoy Truck Stop for which Savoy Truck Stop failed to pay BH & Associates.

-3-

On April 24, 2004, at around the same time that Xtra Tank folded and Xtra Petroleum was founded, Mr. Parseghian entered into a "Promissory Note and Guaranty Agreement," individually and as a partner in Savoy Truck Stop, under which Savoy Truck Stop and Mr. Parseghian agreed to pay BH & Associates the principal sum of $709,131.68, bearing interest at 12% per annum, by May 28, 2004. *See* Defendant's Exhibit J. Neither Savoy Truck Stop nor Mr. Parseghian paid this debt. BH & Associates filed a lawsuit against Savoy Truck Stop and Mr. Parseghian in Idaho, obtained a default judgment, and domesticated that judgment in California.

In November 2004, at Mr. Parseghian's request, Brad Hall – the eponymous CEO of BH & Associates – met with Mr. Parseghian at a Salt Lake City airport. At the airport, BH & Associates, Sarkis Parseghian, and Marwan El-Dana executed a handwritten settlement agreement in order to dictate agreed payment terms regarding the Idaho default judgment and other agreements among the parties. *See* Defendant's Exhibit B. BH & Associates received only two payments pursuant to this agreement. One was a March 2005 cashier's check obtained by Kathy Parseghian in the amount of $21,000. *See* Exhibit X. The other was an April 2005 cashier's check obtained by Xtra Petroleum in the amount of $10,000. The $10,000 cashier's check was accompanied by a note reading "To Brad Please Apply $10K to Savoy old balance." *See* Exhibit W. Mrs. Parseghian testified that none of Xtra Petroleum's assets were used to purchase these checks and that she purchased them in the names of herself and Xtra Petroleum so that the bank would not charge fees for issuing the cashier's checks.

This was the extent of relevant communication and actions between the parties for several years.

*Brad Hall v. Xtra Petroleum Transport, Sarkis Parseghian, and Kathy Parseghian*

BH & Associates learned that Xtra Petroleum was operating in New Mexico and domesticated its judgment against Savoy Truck Stop and Mr. Parseghian in New Mexico in January 2008. *See* Defendant's Exhibit E. In February 2008, BH & Associates filed a complaint in the Second Judicial District Court for the State of New Mexico, alleging alter ego and fraudulent transfer claims against Xtra Petroleum and both Mr. and Mrs. Parseghian. BH & Associates sought, *inter alia*, relief in the amount of $718,313.68. *See* Exhibit G. The court granted summary judgment dismissing all claims against Kathy Parseghian, individually, with prejudice. *See* Plaintiff's Exhibit 6. All fraudulent transfer claims against Xtra Petroleum and Mr. Parseghian were dismissed with prejudice as well. *See* Plaintiff's Exhibit 5. Additionally, Xtra Petroleum obtained summary judgment against BH & Associates on a counterclaim in the amount of $81,926.18 in July 2009. No summary judgment was granted on BH & Associates' alter ego claim against Xtra Petroleum or Mr. Parseghian.

BH & Associates, Mr. Parseghian, and Xtra Petroleum completed discovery in the state court litigation and submitted a substantial 23-page pretrial order relating to BH & Associates' alter ego claim against Xtra Petroleum and Mr. Parseghian which was entered on August 18, 2009. *See* Defendant's Exhibit I. BH & Associates, Xtra Petroleum, and Mr. Parseghian were ready to proceed to a jury trial on the alter ego claim, when, on some undetermined date in September 2009, Mr. Parseghian, Xtra Petroleum, and BH & Associates entered into a settlement agreement (the "2009 Settlement Agreement" or "Agreement"). Under that Agreement, Xtra Petroleum and Mr. Parseghian agreed to pay $610,000 to BH & Associates to resolve BH & Associates' alter ego claim against them.

When Mrs. Parseghian was asked if she was concerned about her husband at the time Xtra Petroleum entered into the 2009 Settlement Agreement, she testified that she was concerned about Xtra Petroleum. Mrs. Parseghian testified that she caused Xtra Petroleum to enter into the 2009 Settlement Agreement for only the following reasons: 1) in order to save on substantial legal fees and traveling costs; and 2) so she could concentrate her time and efforts on operating Xtra Petroleum. The Court does not find it credible that these were the sole reasons for Xtra Petroleum entering in the 2009 Settlement Agreement. Xtra Petroleum had already incurred more than $200,000 in legal fees in conducting discovery and in other trial preparation. The pre-trail phase of the case had been completed. The trial was estimated to last four days. Xtra Petroleum's additional legal fees to proceed to trial were certainly likely to be less than $610,000. The settlement amount of $610,000 is also very close to the amount of BH & Associates' asserted under its alter ego claim against Xtra Petroleum and Mr. Parseghian, net of Xtra Petroleum's the $81,926.18 judgment against BH & Associates.

*The Debtor's Financial Condition at the Time of the Settlement*

The preponderance of the evidence shows that the Plaintiff was insolvent at the time of execution of the 2009 Settlement Agreement. The company's balance sheet contained within Xtra Petroleum's 2009 federal income tax return, Schedule L of Form 1120, reflects total assets in the amount of $1,490,223 and total liabilities in the amount of $1,190,809 as of December 31, 2009, excluding the $610,000 obligation incurred by Xtra Petroleum in September 2009 under the 2009 Settlement Agreement. Including the $610,000 obligation, the balance sheet reflects total assets of $1,490,223 and total liabilities of $1,800,809. The assets reported on the balance sheet include Xtra Petroleum's petroleum blending facility located on Broadway Avenue in

-6-

Case 12-01155-j    Doc 21    Filed 04/11/12    Entered 04/11/12 17:33:48 Page 6 of 20

Albuquerque, New Mexico (the "Blending Facility Property"), both land and improvements, as having a value of $1,313,909.

BH & Associates argues that the 2009 tax return understates the amount of Xtra Petroleum's assets as of September 2009, when the 2009 Settlement Agreement was made, because the returns indicate that Mrs. Parseghian was taking distributions from Xtra Petroleum in 2009; therefore its assets in September 2009 may have substantially exceeded the year-end asset value of $1,490,223. The Court finds that the tax returns do not establish that Mrs. Parseghian was taking distributions from Xtra Petroleum in 2009 for several reasons. The company's balance sheet contained within Xtra Petroleum's 2009 federal income tax return reflects a reduction in Additional Paid-In Capital and a reduction in Retained Earnings for calendar year 2009 in the amounts of $228,441 and $249,701, respectively, a taxable loss for the year in the amount of $378,353, and a depreciation deduction for the year in the amount of $130,627. No testimony was given to reconcile or account for these figures. The Court can draw no conclusion from these figures that they reflect shareholder distributions. Further, during 2009, Xtra Petroleum was suffering critical cash shortfalls. Mrs. Parseghian was doing what she could to raise cash to keep the company afloat, including the borrowing of approximately $200,000 from a friend, referred to at trial as Mr. Avaikian; she was not taking distributions.

The Court also finds that when Xtra Petroleum incurred its obligations under the 2009 Settlement Agreement, the fair market value of the Blending Facility Property was substantially less than the $1,313,909 book value reflected in the 2009 tax return. Xtra Petroleum purchased the Blending Facility Property in 2006 for $475,000, and thereafter made improvements to the property at a cost of approximately $50,000. Based on an appraisal of the Blending Facility Property made after the purchase, Xtra Petroleum booked the property on acquisition as having a

value of $1,731,625, including land and improvements. Mrs. Parseghian attributed the discrepancy between the $1,731,625 value assigned to the Blending Facility Property on the company's books and the $475,000 price to her having made a good deal when purchasing the property. She testified the property was purchased in an arm's length transaction and not from an insider. The seller financed a portion of the purchase price. The $1,313,909 value listed on the 2009 year-end balance sheet represented an initial 2006 year-end book value of $1,755,459.59 (that included some equipment purchased prior to acquisition of the Blending Facility Property, less accumulated depreciation and adjusted by the purchase or sale of any depreciable assets in 2007, 2008 or 2009).

Although Ms. Parseghian testified that in her opinion, when the 2009 Settlement Agreement was made, the Blending Facility Property had a fair market value of $1.6 million, the Court does not find that testimony credible. Xtra Petroleum listed the Blending Facility Property for sale for $1.6 million shortly after the 2009 Settlement Agreement was made, and later lowered the listing price to $1.2 million. The only offer received to purchase the property was less than $400,000. It is not credible that the property had a value of $1,755,459.59 upon its purchase in 2006 for $475,000 in an arm's length transaction that included seller financing. Further, the severe economic downturn that inflicted the New Mexico economy after 2006, and continuing through at least the fall of 2009, supports a reduced value, not an increased value, of the property after its purchase in 2006.

*Xtra Petroleum's Liquidation Analysis*

Pursuant to the 2009 Settlement Agreement, Xtra Petroleum paid $95,000 to BH & Associates between September 23, 2009 and April 25, 2009. Of those monies, $50,000 was paid within one year of the date Plaintiff commenced its voluntary chapter 11 case on June 6, 2011

-8-

Case 12-01155-j    Doc 21    Filed 04/11/12    Entered 04/11/12 17:33:48 Page 8 of 20

(the "Petition Date"), and $10,000 was paid within 90 days prior to the Petition Date ($5,000 on March 16, 2011 and $5,000 on April 25, 2011). In evidence is Plaintiff's liquidation analysis contained in its disclosure statement filed in its underlying bankruptcy case pursuant to 11 U.S.C. § 1125. The liquidation analysis reflects total assets in the amount of $930,239.52, payments from those assets in a hypothetical chapter 7 case to secured creditors, and for chapter 7 and 11 administrative expenses and priority unsecured claims, in the total amount of $936,175.10, with no funds available to pay holders of non-priority unsecured claims. *See* Plaintiff's Exhibit 15. For purposes of the liquidation analysis, Xtra Petroleum values the Blending Facility Property at $697,363.62, based on an assessment that in a chapter 7 case the holder of the first mortgage lien against the property would be permitted to foreclose the lien, and no proceeds from the sale would be available to other creditors. *Id.* The only evidence to refute any aspect of the liquidation analysis was Ms. Parseghian's testimony that the Blending Fuel Facility had a value of $1.6 million, which, as stated above, is not credible. The Court finds that if Xtra Petroleum had filed a case under chapter 7 on the Petition Date, instead of a case under chapter 11, in the chapter 7 case holders of non-priority unsecured claims would receive no distribution from the estate.

**DISCUSSION**

*Fraudulent Transfer*

Xtra Petroleum seeks to set aside its $610,000 obligation to BH & Associates incurred under the 2009 Settlement Agreement as a fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1). The Court denies the fraudulent transfer claim because the Plaintiff has not established by a preponderance of the evidence that it received less than a reasonably equivalent value when it incurred that obligation.

Xtra Petroleum asserts that the obligation in question is avoidable under Section 548(a)(1)(B) based on the following: a) incurring the obligation rendered it insolvent; and b) Xtra Petroleum received less than a reasonably equivalent value in exchange for such obligation. Under Section 548(a)(1)(B) of the Bankruptcy Code, a debtor in possession may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor if the debtor made such transfer or incurred such obligation within two years before the date of the filing of the bankruptcy petition and: (1)"received less than a reasonably equivalent value in exchange for such transfer or obligation," and (2) meets any one of four other conditions, one of which is that the debtor "was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation."

The evidentiary burden to establish a prima facie case of an avoidable fraudulent transfer under 11 U.S.C. § 548 rests on the plaintiff. *See In re TOUSA, Inc.*, 444 B.R. 613, 649-50 (S.D.Fla.2011) ("Under Section 548(a)(1), the party alleging a fraudulent transfer bears the burden of proving that the debtor did not receive reasonably equivalent value in exchange for the property transferred and obligations incurred."). *See, also, In re Renaissance Hospital,* 2011 WL 5240265, at *2 (Bankr.N.D.Tex.) ("Plaintiff bears the burden of proof on all elements in a fraudulent transfer action.").

The Plaintiff-Debtor has established by a preponderance of the evidence that the Debtor was insolvent on the date it incurred the obligation under the 2009 Settlement Agreement to pay BH & Associates the sum of $610,000, or became insolvent as a result its having incurred the obligation. For purposes of 11 U.S.C. § 549(a)(1)(B)(ii)(I), insolvency is determined using a balance sheet test; that is, by determining whether the debtor's total liabilities exceed the value of its assets. *See In re Solomon*, 299 B.R. 626, 639 (10th Cir. BAP 2003)(for avoidance of transfer

-10-

Case 12-01155-j    Doc 21    Filed 04/11/12    Entered 04/11/12 17:33:48 Page 10 of 20

purposes, under the Bankruptcy Code the test of insolvency is "the 'balance sheet' test ( *i.e.* liabilities greater than assets at fair valuation."). The Court has found that as a result of Xtra Petroleum having incurred the $610,000 obligation under the 2009 Settlement Agreement, Xtra Petroleum's liabilities exceeded the value of its assets. Therefore, Xtra Petroleum was "insolvent" upon its execution of the 2009 Settlement Agreement, as that term is used in Section 549(a)(1)(B)(ii)(I).

Having found that entering into the 2009 Settlement Agreement rendered Xtra Petroleum insolvent, the Court must now consider whether the Xtra Petroleum received "reasonably equivalent value" in exchange for its promise to pay $610,000 under the 2009 Settlement Agreement. There is no one accepted definition of what constitutes "reasonably equivalent value" as that phrase is used in 11 U.S.C. § 548(a)(1)(B)(i);[1] a court should "evaluate the value given for a payment at the time payment is made." *In re Renaissance Hospital* at *3. "Although the minimum quantum necessary to constitute reasonably equivalent value is undecided, a debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value." *Id.* at *3, citing *Butler Aviation International, Inc. v. Whyte (In re Fairchild Aircraft Corp.),* 6 F.3d 1119, 1125-26 (5th Cir. 1993). In determining whether "reasonably equivalent value" was obtained by a debtor, bankruptcy courts frequently consider the totality of the circumstances surrounding the allegedly fraudulent transfer. *See, e.g., In re TOUSA, Inc.* 444 B.R. at 646-649; *In re Chase,* 328 B.R. 675, 678-683 (Bankr.D.Vt.2005).

In addition, in the context of a fraudulent transfer action seeking to set aside a settlement, the Court finds that it is appropriate to take into account the strong public policy favoring settlement agreements. *See, e.g., McDermott, Inc. v. AmClyde,* 511 U.S. 202, 215, 114 S.Ct 1461, 1468 (1994) ("...public policy wisely encourages settlements..."); *In re Artha*

---

[1] *Cf. BFP v. Resolution Trust Corp.,* 511 U.S. 531, 114 S.Ct. 1757 (1994).

-11-

*Management, Inc.,* 91 F.3d 326, 329 (2d.Cir. 1996) (court declines to set aside settlement agreement as a fraudulent transfer, noting "…public policy favor[s] settlements…"). Bankruptcy, wherein at least one party has limited resources by definition, is certainly no exception to this rule. *See, e.g., In re Pfiester,* 449 B.R. 422, 425 (Bankr.D.N.M. J.Starzynski 2011) ("The law favors resolving controversies through compromise and settlement rather than through litigation. Settlement of litigation is usually a compromise of disputed liability by the parties and is favored as a matter of public policy."), *citing Williams v. First National Bank,* 216 U.S. 582, 592, 30 S.Ct. 441, 444 (1910); *Smith v. Munro*, 134 Vt. 417, 365 A.2d 259 (1976)*; In re DB Capital Holdings, LLC,* 454 B.R. 804, 813-814 (Bankr.D.Colo.2011) (decision relying on the "legitimate public policy of encouraging out–of-court restructuring and settlements."). Absent an adequate showing by Xtra Petroleum that it did not receive a reasonably equivalent value in exchange for the obligation it incurred under the 2009 Settlement Agreement, the Court will not avoid that obligation as a fraudulent transfer, a result bolstered by the public policy favoring settlements.

Xtra Petroleum entered into the 2009 Settlement Agreement after the close of discovery and entry of the final pre-trial order in the state action that was settled. Kathy Parseghian testified that one reason Xtra Petroleum agreed to settle was to avoid a jury trial on BH & Associates' alter ego claim against it, estimated to last four days. To determine whether Xtra Petroleum received "reasonably equivalent value" in exchange for its obligations under the 2009 Settlement Agreement, the Court must examine the terms and conditions of that obligation.

Under the 2009 Settlement Agreement, Xtra Petroleum and Mr. Parseghian agreed to pay BH & Associates the sum of $610,000, payable as follows: (a) $10,000 by October 1, 2009; (b) $5,000 per month beginning November 1, 2009 for seventy-two months, with interest at the rate

of 5% per annum; and (c) the balance of $392,216,216.81 on November 1, 2015. Further, Xtra Petroleum agreed to forbear from collecting on its $81,926.18 judgment against BH & Associates pending payment in full of the $610,000 with interest, and to release its claim for $81,926.18 upon Xtra Petroleum satisfying its payment obligations under the 2009 Settlement Agreement. In addition, Xtra Petroleum agreed to execute a promissory note in favor of BH & Associates in the amount of $610,000, and to grant to BH & Associates a deed of trust against the Blending Facility Property as collateral for the $610,000 obligation. The 2009 Settlement Agreement states that Xtra Petroleum also will execute a security agreement listing all stock of Xtra Petroleum as collateral for payment of the promissory note, and that the stock and the deed of trust would be held in escrow pending payment of the promissory note in full. The 2009 Settlement Agreement states that upon payment of the note in full, the stock would be returned to Kathy Parseghian and the deed of trust would be released and satisfied.

Xtra Petroleum paid BH & Associates a total of $95,000 under the 2009 Settlement Agreement over a period of approximately 20 months before it ceased making payments. The Agreement provides that upon a default in payment of the $610,000 obligation to BH & Associates, BH & Associates may obtain the stock of Xtra Petroleum and deed of trust out of escrow, and exercise one of the following two remedies: (a) BH & Associates may "foreclose its interest on the assets of XTRA [Petroleum]; or (b) BH & Associates may "refile the Lawsuit against Xtra [Petroleum] and Sarkis [*i.e.* Mr. Parseghian] seeking the full amount of the Idaho judgment reference above [i.e. the default judgment against Savoy Truck Stop and Mr. Parseghian entered by an Idaho court].[2] In addition, the 2009 Settlement Agreement provides that if BH & Associates were to file such a new lawsuit on its alter ego claim, the $81,926.18

---

[2] The 2009 Settlement Agreement settled BH & Associates' claim that Xtra Petroleum was liable to BH & Associates for the amount of the BH & Associates' Idaho judgment against Savoy Truck Stop on an alter ego theory.

-13-

judgment Xtra Petroleum obtained against BH & Associates on Xtra Petroleum's counterclaim in the Idaho lawsuit would be "reinstated in its current form and [BH & Associates] will not challenge it."

Although the 2009 Settlement Agreement contemplated execution of a deed of trust and security agreement, no such deed of trust or security agreement was executed. Further, there is no evidence before the Court that the promissory note contemplated by the Agreement was executed. And although the 2009 Settlement Agreement provided that Xtra Petroleum would execute a security agreement listing the stock of Xtra Petroleum as collateral for payment under the promissory note, Xtra Petroleum did not own the stock. Kathy Parseghian owned the stock. The Settlement Agreement does not name Kathy Parseghian as a party to the Agreement. She executed the 2009 Settlement Agreement on behalf of Xtra Petroleum, and apparently did deliver her stock to an escrow agent.

A promissory note, security agreement, and deed of trust should have been executed as part of the closing of the 2009 Settlement Agreement. However, because Xtra Petroleum did not execute the deed of trust, under the section of the 2009 Settlement Agreement describing remedies on default, BH & Associate's sole remaining remedy against Xtra Petroleum for breach of the obligation to pay $610,000 is to reinstate BH & Associates' claim against Xtra Petroleum and Sarkis Parseghian that was settled by the 2009 Settlement Agreement. *See* 2009 Settlement Agreement, ¶7. Xtra Petroleum retains the right to defend the claim on the merits.

The Court need not decide here whether BH & Associates' remedy in the 2009 Settlement Agreement to obtain the stock of Xtra Petroleum, which is owned by Kathy Parseghian, is available to BH & Associates. Even if BH & Associates has such a right, any transfer of the stock to BH & Associates would not be a transfer of property of the debtor, and

-14-

therefore Xtra Petroleum may not avoid it as a fraudulent transfer. Because the remedies available to BH & Associates upon a default under the 2009 Settlement Agreement, in fact, are fewer and less valuable than what was contemplated under the Agreement, Xtra Petroleum, in fact, gave up less in consideration for incurring obligations under the 2009 Settlement Agreement, for purposes of determining whether it received a reasonably equivalent value in exchange for entering into the Agreement.

Mrs. Parseghian testified that the only reasons that Xtra Petroleum agreed to the 2009 Settlement Agreement were: 1) to avoid legal fees; and 2) to enable her to focus more time and effort on running Xtra Petroleum's business. The Court does not find this testimony to be credible. The 2009 Settlement Agreement was made after Xtra Petroleum had incurred legal fees in excess of $200,000 in the pre-trial phase of the case. The case was ready for trial. Why would Xtra Petroleum agree to settle for $610,000 in order to avoid legal fees and to allow Kathy Parseghian to focus more time and effort on the business when the case was already poised for a four-day trial? The bulk of the legal fees had already been incurred at that stage in the litigation. Xtra Petroleum would lose considerably more money by settling than if it had proceeded with the litigation and prevailed. There must have been another reason, or other reasons, that motivated the settlement.

The pre-trial order entered in the case contains 59 paragraphs of disputed facts detailing BH & Associates' claimed factual basis for the alter ego claim. Xtra Petroleum faced the inherent risks associated with a jury deciding an alter ego claim. Xtra Petroleum settled in consultation with counsel. The value Xtra Petroleum received under the 2009 Settlement Agreement consisted of much more than avoiding additional legal fees and personal stress associated with a four-day trial. The value Xtra Petroleum received under the 2009 Settlement

Agreement also included the following: (a) Xtra Petroleum avoided the risk of an adverse judgment resulting from a jury trial; (b) Xtra Petroleum obtained a dismissal, without prejudice, of BH & Associates' alter ego claim against it; (c) BH & Associates' forbearance from exercising remedies against Xtra Petroleum so long as payments were made on the $610,000 obligation under the 2009 Settlement Agreement, thereby giving Xtra Petroleum the opportunity to turn the company around and avoid either liquidation or bankruptcy; and (d) Xtra Petroleum gained the advantage of additional delay in the event BH & Associates exercised remedies upon a default under the 2009 Settlement Agreement. The Court finds that the value of the consideration Xtra Petroleum received in exchange for entering into the 2009 Settlement Agreement, coupled with BH & Associates' limited remedies against Xtra Petroleum upon a default under the 2009 Settlement Agreement, constitutes reasonably equivalent value for its promise to pay BH & Associates $610,000.00 under the Settlement Agreement.

Based on the foregoing, the Court concludes that Xtra Petroleum received a reasonably equivalent value in exchange for incurring its obligations under the 2009 Settlement Agreement. Xtra Petroleum's claim to avoid its obligations under the 2009 Settlement Agreement as a fraudulent transfer, pursuant to 11 U.S.C. § 548(a)(1)(B), therefore is denied.

*Preferential Transfer Claim*

Plaintiffs assert that if its payment obligation to BH & Associates under the 2009 Settlement Agreement is not avoided as a fraudulent transfer, then the payments it made under the Agreement should be avoided and recovered pursuant to 11 U.S.C. §§ 547(b) and 550(a). Section 547(b) provides, subject to certain exceptions:[3]

> [T]he trustee may avoid any transfer of an interest of the debtor in property –
> (1) to or for the benefit of a creditor;

---
[3] BH & Associates has not alleged that any of the exceptions to the avoidability of a preferential transfer contained in 11 U.S.C. § 547(c) are applicable.

> (2) for or on account of an antecedent debt owed by the debtor before such transfer
>     was made;
> (3) made while the debtor was insolvent;
> (4) made –
>     (A) on or within 90 days before the date of the filing of the petition; or
>     (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;
>     ***and***
> (5) that enables such creditor to receive more than such creditor would receive if—
>     (A) the case were a case under chapter 7 of this title;
>     (B) the transfer had not been made; and
>     (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547 (2006) (emphasis added).

As the conjunctive term "and" indicates, Xtra Petroleum must establish five elements to prove its prima facie preferential transfer claim.

The Court begins by examining the fourth element. There is no evidence that BH & Associates is an insider of Xtra Petroleum. "Insider" is a term of art defined by § 101(31) of the Bankruptcy Code. Subsection (B) thereof defines insiders of a corporate debtor to include directors and officers of the debtor, persons in control of the debtor, partnerships in which the debtor is a general partner, a general partner of the debtor, and a relative of any of the preceding entities. BH & Associates, the creditor from whom Xtra Petroleum seeks recovery, is not an insider of Xtra Petroleum under any of the subsections of § 101(31)(B), nor is there any evidence that BH & Associates otherwise is an insider. Accordingly, the reach back period for Xtra Petroleum's preferential transfer claim is 90 days, not one year.[4] Thus, Plaintiff's preferential

---

[4] Xtra Petroleum, in relation to its 11 U.S.C. 547 claim, asserts that the payments it made to BH & Associates were made for the benefit of Mr. Parseghian, who is an insider, and therefore the reach back period is one year, not 90 days. However, Xtra Petroleum may not recover on account of its preferential transfer claim any monies it paid more than 90 days prior to the Petition Date for the benefit of Mr. Parseghian because the transferee, BH & Associates, is not an insider. *See* 11 U.S.C. § 550(c).

-17-

transfer claim is limited to recovery of the $10,000 it paid BH & Associates within 90 days prior to the Petition Date.

Xtra Petroleum has satisfied each of the other four elements of a fraudulent transfer claim under 11 U.S.C. § 547 with respect to the $10,000 that Xtra Petroleum paid BH & Associates within 90 days prior to the Petition Date. Regarding the first element, such moneys were paid "for the benefit of" BH & Associates. Xtra Petroleum owed a debt to BH & Associates under the 2009 Settlement Agreement, and made the payments on that debt. Regarding the second element, it is uncontested that the payments in question made in 2011 were made on a debt Xtra Petroleum incurred in 2009, which constituted payments made for or on account of an antecedent debt owed by Xtra Petroleum before such payments were made. Regarding the third element, insolvency is presumed in the 90 days prior to commencement of the bankruptcy case. 11 U.S.C. § 547(f). BH & Associates did not present evidence to rebut the presumption.

The final element, which is set forth in Section 547(b)(5), requires Xtra Petroleum to establish that the payments it made within the 90-day reach back period enabled BH & Associates to receive more than such it would have received if (a) Xtra Petroleum filed a chapter 7 case on the Petition Date instead of a chapter 11 case (b) the payments had not been made, and (c) BH & Associates received payment of its claim in the chapter 7 case to the extent provided by the Bankruptcy Code. The Court finds that Xtra Petroleum has met its burden of proof on the fifth element. Xtra Petroleum's hypothetical chapter 7 liquidation analysis reflects no distributions from the estate to non-priority unsecured creditors in a hypothetical chapter 7 case. While BH & Associates urges the Court to adjust Xtra Petroleum's hypothetical chapter 7 liquidation analysis by utilizing a $1.6 million for the value of the Blending Facility Property, this Court finds for reasons previously stated, that all net proceeds from the sale of the Blending

Facility Property would be paid in a chapter 7 case to the holder of the first lien against the property, and none of the sale proceeds would have been available to pay other creditors.

Under 11 U.S.C. § 550(a), the Court may order that Xtra Petroleum may recover for the benefit of the estate the value of the property transferred, if the Court avoids the transfer as a preferential transfer, in lieu of requiring the transferee to return the property. Here, because the transferred property is money, the Court will order that Xtra Petroleum may recover the value of the transferred property for the benefit of the estate.

The Court, therefore, concludes that the $10,000 Xtra Petroleum paid BH & Associates within 90 days prior to the Petition Date, constitutes a recoverable preferential transfer under 11 U.S.C. §§ 547 and 550(a). The remainder of Xtra Petroleum's preferential transfer claim will be denied.

**CONCLUSION**

For the forgoing reasons, Xtra Petroleum's claim under 11 U.S.C. § 548 to avoid its obligations under the 2009 Settlement Agreement as a fraudulent transfer will be denied. Xtra Petroleum's claim under 11 U.S.C. §§ 547 and 550 to avoid prepetition transfers to BH & Associates as preferential transfers and to recover the funds paid will be granted to the extent of $10,000 and otherwise will be denied. The Court will enter a judgment consistent with this Memorandum Opinion.

/s/ Robert H. Jacobvitz
Robert H. Jacobvitz
United States Bankruptcy Judge

Entered on Docket Date: 4/11/12

COPY TO:

Attorneys for Plaintiff
William F. Davis
Andrea D. Steiling
William F. Davis & Associates
6709 Academy NE, Suite A
Albuquerque, NM 87109


Attorneys for Defendant
Denise J. Trujillo
Dean Cross
George "Dave" Giddens, PC
10400 Academy Rd NE Ste 350
Albuquerque, NM 87111